BONNER et al. v. UNITED STATES.*
No. 7447.

Circuit Court of Appeals, Fifth Circuit.
Jan. 10, 1935.

Rehearing Denied Feb. 9, 1935.

Leonard Brown, T. P. Hull, Herbert Oliver, and Dave Watson, all of San Antonio, Tex., J. H. Cunningham, Jr., of St. Louis, Mo., and Harold J. Bandy, of Granite City, Ill., and William C. Orchard and James Edward Reed, both of New Orleans, La., for appellants.

W. R. Smith, Jr., U. S. Atty., and Ben F. Foster and James F. Jackson, Asst. U. S. Attys., all of San Antonio, Tex.

Before BRYAN, FOSTER, and WALKER, Circuit Judges.

BRYAN, Circuit Judge.

In a criminal prosecution under 12 US CA § 592, appellants Bonner, Cunningham, and Morrow were convicted upon five counts of an indictment charging Bonner with five separate offenses of embezzlement of the funds of the Commercial National Bank of San Antonio, Tex., of which he was alleged to be the president, "with intent to defraud" that bank, and charging others, including Cunningham and Morrow, "with like intent," with aiding and abetting Bonner in the commission of those offenses. Appellants were also convicted upon companion

*Rehearing denied Feb. 9, 1935.

counts alleging misapplication of the bank's funds and the making of false entries in the bank's books, and upon a single count for conspiracy; but, in the view we take of the case, all except the charges relating to embezzlement may be disregarded. A maximum sentence for a single offense was imposed generally on three embezzlement and several misapplication and false entry counts; and likewise a sentence, less than the maximum provided by law for any one of the substantive offenses, was imposed generally on the other two embezzlement counts, the remaining misapplication and false entry counts, and the conspiracy count, with the result that the embezzlement counts alone were sufficient to support both sentences. Assuming that the question whether the judgments should be affirmed or reversed depends upon the charges and proofs of embezzlement, the only assignments properly presented for our consideration are that the trial court erred in overruling (1) the demurrers of appellants to the embezzlement counts, and (2) their motions for directed verdicts.

█ Appellants argue that their demurrers should have been sustained because of the failure of the indictment to allege that Cunningham and Morrow knew Bonner was president of the bank, and also because the allegation that they aided and abetted him with "like intent" was insufficient; but we think the indictment, in the particulars complained of, was sufficient. United States v. Northway, 120 U. S. 327, 7 S. Ct. 580, 30 L. Ed. 664; Claassen v. United States, 142 U. S. 140, 12 S. Ct. 169, 35 L. Ed. 966.

█ As to the evidence: In November, 1932, five United States government bonds, each for $100,000, payable to bearer, were stolen from a bank in New York City. In March, 1933, all these bonds came into the possession of the bank in San Antonio of which Bonner was president. Morrow delivered them all to Bonner, one each on March 1, 20, 21, 22, and 23. Appellants agree that on March 1 Cunningham and Morrow came to the bank and before the first bond was delivered Bonner had the cashier make out a bank draft on a branch Federal Reserve Bank in San Antonio for $100,000, and that amount of money was delivered to Bonner by the cashier in the presence of Cunningham and Morrow. After this was done Bonner sent the bond over to the Federal Reserve and borrowed $100,000 on it. The other bonds were handled in practically the same way, except that the drafts on the Federal Reserve were for $92,500 each, although the full amount of $100,000 was borrowed on each. The cash proceeds of each draft were taken in $50 and $100 bills. All these transactions occurred while the market price of the bonds was around 98 per cent. of par. Under Bonner's instructions book entries were made purporting to show that the bank had purchased these bonds for $92,500 each. What was done by Bonner with the cash received from the Federal Reserve Bank is the crucial question of fact in the case. It is the government's theory that on each transaction Morrow received $65,000 or less and that Bonner took the difference of $27,500 or more and divided it up between himself, Cunningham, who was attorney for the bank, and Royster. Royster, who was indicted as an aider and abettor along with Cunningham and Morrow, entered a plea of nolo contendere, turned state's evidence, and became the principal witness for the prosecution. According to his testimony, in the summer of 1932 he told Cunningham that he had been shown $400,000 worth of government bonds which he thought could be bought for much less than their market value.

Cunningham appeared to be much interested and expressed the belief that Bonner would buy the bonds for the bank. They went together to see Bonner, who said he was willing to buy government bonds if he could get them for about 65 per cent. of par, and was willing to take them at that price even though they had been stolen. Following that interview Royster said he traveled over the country in an effort to find cheap government bonds for sale, sometimes at his own expense and sometimes at the expense of Cunningham or Bonner; and finally at New Orleans in February, 1933, he sought out Morrow and told him of Bonner's proposition. A few days later Royster and Morrow appeared together at Cunningham's office in San Antonio, where Royster introduced Morrow to Cunningham. Royster was not present at any conference between the appellants at the bank, but testified that he received from Bonner $35,000 or $40,000 as his share of the money realized from the purported sale and purchase of the stolen bonds. Letters from Cunningham to Royster introduced in evidence furnished strong corroboration of the latter's testimony. Both Cunningham and Bonner gave a false description of Morrow to the representative of a company which carried some of the insurance on the bonds in favor of the New

York bank from which they were stolen. Crowther, cashier of the San Antonio bank, testified that he cashed a semi annual interest coupon clipped from one of the bonds at the request of Bonner, who said the coupon belonged to Cunningham. During these several bond transactions, Bonner and Cunningham each placed in safety deposit boxes over $30,000 in $50 and $100 bills. They admitted that they paid out these large amounts in cash or in the purchase of cashier's checks payable to their creditors, and attempted to explain how they happened to have so much currency on hand. But their explanations, to say the least, were such as the jury were not bound to accept as true. Royster paid for an automobile and an airplane in bills of the same denominations.

In our opinion there was abundant evidence to warrant the jury in finding each of the defendants guilty. In each of the several transactions of purported sale and purchase of bonds Bonner first withdrew from the Federal Reserve $92,500 of the bank's money, and then, putting up a bond as security, borrowed $100,000 on it, thus using the loan on one bond to purchase another. It is a fair inference from the facts and circumstances that Bonner converted some of the bank's money to his own use as each transaction was completed, the amount so converted being indicated by the money traced into the possession of Bonner and Cunningham, and by Royster's testimony as to the amount he received. These amounts added together tend to show that Morrow received about 65 per cent. of par, leaving some 27.5 per cent. to be divided between Bonner, Cunningham, and Royster. It was therefore open to the jury to find that the money which these three defendants received was embezzled from the bank. It is not difficult to conclude from the evidence that Bonner, Cunningham, and Royster were acting in concert in the furtherance of a common plan, or that Bonner was aided and assisted in carrying out that plan by Cunningham and Royster. The government's evidence also supports the reasonable conclusion that Morrow, with full knowledge of the plan already formed, joined with the others in carrying it out. Morrow does not occupy the position of an innocent owner of the bonds; if he did, he would not have needed to seek out a purchaser at less than the market price. He had on hand stolen bonds which he could get rid of more easily through the facilities of a bank than in any other way. Because the bonds were stolen he was willing to dispose of them for much less than they were worth, or so the jury may have found. By permitting them to be used as they were to replenish the bank's deposit with the Federal Reserve, so that they could all be paid for through the facilities of the bank, Morrow accomplished his purpose of realizing money on them, but in doing so he aided and abetted Bonner in the embezzlement of the bank's funds.

The appeals present no reversible error. The judgments are affirmed.